## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| LAMONT CAMBELL, | ) | |
| | ) | |
| *Plaintiff* | ) | Case No. _____ |
| | ) | |
| v. | ) | |
| | ) | |
| JIMMY HYATT, | ) | Division |
| Detective, St. Louis Metropolitan Police | ) | |
| Department, in his individual capacity, | ) | |
| St. Louis Metropolitan Police | ) | |
| Department, in his individual capacity, | ) | |
| MICHAEL PRATT, | ) | |
| Detective St. Louis Metropolitan Police | ) | |
| Department, in his individual capacity, | ) | JURY TRIAL DEMANDED |
| JOHN WINTER, | ) | |
| Detective, St. Louis Metropolitan Police | ) | |
| Department, in his individual capacity, | ) | |
| JOSEPH DUDLEY, | ) | |
| Detective St. Louis Metropolitan Police | ) | |
| Department, in his individual capacity, | ) | |
| THE CITY OF ST. LOUIS, a Municipal | ) | |
| Corporation, | ) | |
| And OTHER UNIDENTIFIED | ) | |
| DEFENDANTS | ) | |

## COMPLAINT AT LAW

NOW COMES Plaintiff, LAMONT CAMPBELL, by Kathleen T. Zellner of the

law firm of Kathleen T.  Zellner & Associates (Motion Pro Hac Vice pending) and

Michael G. Berry & Newman Comley Ruth, P.C., and complaining of Defendants

JIMMY HYATT, MICHAEL PRATT, JOHN WINTER, and JOSEPH DUDLEY

("Defendant Officers"), THE CITY OF ST. LOUIS, and OTHER UNIDENTIFIED

DEFENDANTS (collectively, "the Defendants") states as follows:

## JURISDICTION AND VENUE

1.    This is a civil rights action for violations of the Fourth and Fourteenth Amendments to the United States Constitution arising from Plaintiff Lamont Cambell's wrongful prosecution and conviction for which he spent over eleven (11) years in prison.

2.    This civil rights action is brought under 42 U.S.C. §1983 against the Defendants, for which this Court has federal question jurisdiction under 28 U.S.C. §1331.

3.    This action seeks damages against Defendants caused by the violation of Plaintiff's constitutional rights.

4.    This action also includes supplemental state law claims for malicious prosecution, civil conspiracy, and indemnification, all arising out of the same events at issue in the claims for which this Court has jurisdiction under 42 U.S.C. §1331.

5.    Plaintiff seeks compensatory and punitive damages against the individual Defendants in their individual capacities and against The City of St. Louis.

6.    Venue is proper in this Court because all or substantially all acts complained of occurred within the City of St. Louis.

## PARTIES

7.    Plaintiff, Lamont Cambell, is a United States citizen and resident of the State of Missouri.

8.    The Defendant Officers, JIMMY HYATT, MICHAEL PRATT, JOSEPH DUDLEY, JOHN WINTER, and OTHER UNIDENTIFIED DEFENDANTS (collectively, "the Defendant Officers"), at all times relevant herein, were employed as police officers in the St. Louis Metropolitan Police Department.

9.    Defendant City of St. Louis is a municipality located in the State of Missouri.

10.    Defendant City of St. Louis operates and controls a police department. Defendant City of St. Louis is liable for the acts of Defendants, while acting within the scope of their employment pursuant to its statutory obligation to indemnify them.

11.    At all relevant times the City of St. Louis was the employer of Defendant Officers.

12.    The Defendant Officers engaged in the conduct complained of under the color of state law and in the course and scope of their employment as police officers with the City of St. Louis.

13.    Each of the Defendant Officers is sued in his or her individual capacity.

## UNDERLYING FACTS

14.    Plaintiff was wrongfully prosecuted and convicted for the murder of Leonard Gregory in St. Louis County, Missouri on October 7, 2016. Due to Defendants' unconstitutional conduct described herein, Plaintiff spent over eleven (11) years (4,156 days) of his life incarcerated serving a life sentence for a brutal murder that he did not commit.

### *The Murder of Leonard Gregory and Initial Investigation at the Scene of the Shooting*

15.    Leonard Gregory ("Gregory") was shot and killed at approximately 3:30 a.m. on July 17, 2011, on the 2800 block of Chariton Street in St. Louis, Missouri. Gregory was the son of a retired St. Louis City Metropolitan Police Sergeant who lived three miles away from the scene of the crime.

16.     Defendant Hyatt and Officers Van Nest and Mercier reported to the scene of the shooting, arriving at approximately 4:16 a.m. and they were met by other officers including Officers Neals and Meeks.

17.     Defendant Hyatt learned that Gregory's vehicle crashed into another vehicle, causing that vehicle to crash into a third vehicle.

18.     Gregory was slumped in the driver's seat of his dark colored SUV with an apparent gunshot wound to his head. He was pronounced dead shortly thereafter.

19.     The area was not well lit.

20.     Defendant Hyatt wrote all the reports of the interviews conducted at the scene.

21.     Defendant Hyatt reported that Officer Mercier interviewed Jeffrey Mooney ("Jeffrey") at the scene and that Jeffrey told her that he heard 2-3 gunshots and observed the SUV moving west before striking another vehicle. He then saw two black females enter the east alley of the 4200 block of Oregon, followed by a black male suspect. The black male turned and ran to the SUV, reached in the front passenger window, and fired several shots through the front passenger door window. He then fled north into the alley, following the path of the two black females.

22.     Defendant Hyatt reported that Officer Mercier claimed that Jeffrey said the black male was approximately 17-19 years old, 5'6" to 5'7" with a dark complexion and short hair, wearing a white shirt, black shorts, and black shoes. He was armed with what Jeffrey believed was a silver handgun.

4

23.    Defendant Hyatt reported that Jeffrey told him that he and his wife Sarah Mooney ("Sarah") had seen the suspect in the area. Jeffrey also believed he could identify one of the black females. Defendant Hyatt claimed that Jeffrey advised him that he and his wife had seen the suspect in the immediate area and was "positive he would be able to identify him again."

24.    Defendant Hyatt reported that Officer Mercier interviewed Sarah at the scene, and that Sarah stated that she was asleep but awoke to the commotion. She looked out her window to see the suspect firing into the window of the vehicle. Instead, Defendant Hyatt reported that Officer Mercier stated that Sarah's description "corroborated with her husband's," but there were no details of any description of the shooter in Defendant Hyatt's report.

25.    Defendant Hyatt reported that Officer Mercier also interviewed Joseph Marshall ("Marshall"), and that Marshall stated that he heard the shots while inside his home. Marshall looked from his home to see the vehicle crash.  Next, Marshall saw a black male, approximately age 20, 5'7" to 5'8" in height, dark complexion, low hair cut, wearing a white shirt and dark shorts and holding a black small caliber pistol, shoot into the vehicle and went north through an alley.

26.    Defendant Hyatt reported that Officer Mercier also interviewed Jason Puder ("Puder"), who lived at 4335 California and was sitting in his living room when he heard the shots. Officer Mercier reported that Marshall heard the shots while inside his home. Puder reported the shooter was wearing a white shirt and dark jeans. Puder said he could not give any additional description of the shooter due to his distance from the incident.

27.     Significantly, Defendant Hyatt was the only investigator to prepare a report of all of the witness interviews, which was later disclosed prior to the prosecution of Plaintiff.

### Continuing Investigation

28.     Later that day, Defendant Hyatt and Officer Sweeney (homicide detectives) met with South Patrol Detectives Defendants Pratt, Winter, and Dudley, discussed the details of their investigation, and requested the assistance of the South Patrol Detectives.

29.     On July 18, 2011, Defendant Hyatt reported that Sarah called and said she and Jeffrey observed one of the females Jeffrey had seen running. Sarah told Defendant Hyatt that this girl was playing basketball in an alley in the 4200 block of California.

30.     Officers Leopold and Bertke responded and identified the female as Juvenile Jazzy J.

31.     Defendant Hyatt and Officer Sweeney confronted Jazzy J, a fifteen-year-old girl, at the police station on July 19, 2011. Despite their confrontational manner, Jazzy J explained that she was not in the area. Other evidence corroborated her statement.  Because it was determined that Jazzy J was not in the area at the time of the shooting and that Sarah and Jeffrey gave a false identification, Jazzy J was released to her parents.

32.     On July 19, 2011, Defendant Hyatt presented Jeffrey with a few photographs of young black men.

33.     One of the photographs was of Plaintiff. Defendant Hyatt did not have a valid reason for placing Plaintiff in the line-up.

34.    Plaintiff was placed in the lineup merely because he was a young black man who lived in the vicinity of the shooting.

35.    Defendant Hyatt claimed that Jeffrey identified Plaintiff as the shooter from a lineup.  In addition to there being no valid reason that Plaintiff's photograph was in the lineup, the circumstances of the lineup were unnecessarily suggestive and calculated to result in Jeffrey's selection of Plaintiff.

36.    That same day, Defendant Hyatt and Officer Sweeny met with Sarah at a Conoco gas station. The gas station was very near Plaintiff's home. They presented Sarah with photographs of young black men. One of the photographs was of Plaintiff. Defendant Hyatt did not have a valid reason for placing Plaintiff in the line-up. Plaintiff was placed in the lineup merely because he was a young black man who lived in the vicinity of the shooting.

37.    Defendant Hyatt claimed that Sarah identified Plaintiff as the shooter from a lineup.  In addition to there being no valid reason that Plaintiff's photograph was in the lineup, the circumstances of the lineup were unnecessarily suggestive and calculated to result in Jeffrey's selection of Plaintiff.

38.    Defendant Hyatt and Officer Sweeny discussed the results of the lineup with Defendants Pratt, Winter and Dudley.

**_The Brutal Arrest of Plaintiff_**

39.    On July 21, 2011, Defendants Pratt, Winter and Dudley went looking for Plaintiff in an unmarked car.

40.     They found Plaintiff and confronted him. Defendant Pratt jumped out of the car and grabbed Plaintiff.  He yelled, "Where are the sacks?"

41.     Plaintiff was physically forced into the back of the Defendants' vehicle next to Defendant Winter.

42.     Defendant Winter said, "You're not that big we can kill you and dump your body in a dumpster."

### *The Beating at Southside Station*

43.     Plaintiff was transported to the Southside Station.

44.     Inside the Southside Station, Plaintiff was forced into a small room with a window covered by a shade.

45.     Plaintiff was handcuffed by his wrist and chained to the floor for three hours. He was never given his *Miranda* rights, nor any food or anything to drink.  He was not permitted to go to the bathroom.

46.     Defendants Pratt and Dudley entered the room. They told Plaintiff they had a warrant for his arrest.  This was not true.

47.     Defendant Dudley asked Plaintiff if he knew who invented the cotton gin. Defendant Dudley also accused Plaintiff of the murder of Gregory. Plaintiff denied any involvement or knowledge of who had been involved, but Defendant Dudley continued to accuse him. Defendant Winter also was present at times during the interrogation of Plaintiff at the Southside Station.

48.     At various times, Defendants Pratt, Dudley and Winter physically struck Plaintiff. They hit him with open fists on the side of his head and on his face.  As a result, he suffered great pain and his lip swelled.

49.     At one point, Defendant Pratt grabbed Plaintiff around his neck with both hands and choked him. He lifted Plaintiff's entire body off of the floor.  Defendant Pratt then slammed Plaintiff back in his chair.

50.     All Defendants were aware of the events that took place at the Southside Station. None of the Defendants prepared a report that reflected that Plaintiff was transported to the Southside Station at any time and no report was disclosed detailing what happened there.

51.     After the brutal interrogation, Defendants Pratt, Dudley, and Winter drove Plaintiff to Homicide Headquarters.

### *Homicide Headquarters*

52.     At Homicide Headquarters, Defendant Hyatt confronted Plaintiff.  Neither Defendant Hyatt nor anyone else Mirandized Plaintiff at that time.

53.     Defendant Hyatt repeatedly and angrily yelled at Plaintiff that he had committed the murder.  Defendant Hyatt ignored Plaintiff's denials.

54.     Defendant Hyatt also advised Plaintiff that his alibi that he was babysitting for his stepsister, Stephanie Miles, was not credible because Miles and his step mother, Tisa Campbell, had criminal records.

55.     Defendant Hyatt told Plaintiff that three witnesses could identify him as the shooter.  He did not identify the witnesses.

*The Line Ups*

56.    Plaintiff was placed in a physical lineup.  He was shorter, smaller, and appeared younger than anyone else in the lineup.

57.    Defendant Hyatt claimed Jeffrey viewed the lineup and selected Plaintiff. Jeffrey was with Defendant Hyatt when he did so. The lineup was unnecessarily suggestive and coercively performed under conditions calculated to result in the selection of Plaintiff as the perpetrator.

58.    Plaintiff was also placed in a lineup that Defendants claim was viewed by Sarah and Sarah selected Plaintiff as the perpetrator. Sarah was with Defendant Hyatt when she did so.

59.    The lineup presented to Sarah was unnecessarily suggestive and coercively performed under conditions calculated to result in the selection of Plaintiff as the perpetrator.

60.    On July 22, 2011, Plaintiff was placed in a photographic array that Defendant Hyatt claimed was viewed by Marshall.

61.    Defendant Hyatt claimed that the array was shown to Marshall at the corner of California and Chariton. This is the corner where Plaintiff routinely got off the school bus to go home.

62.    Defendant Hyatt claimed that Marshall selected Defendant as the perpetrator.

63.    The lineup presented to Marshall was unnecessarily suggestive and prejudicial under conditions calculated to result in the selection of Plaintiff as the perpetrator.

64.     Marshall told Defendants he was not 100% sure as to his identification of Plaintiff.

65.     The procedures used in the photo and live line-ups were not only unduly suggestive, but overwhelmingly unfairly prejudicial to Plaintiff's rights as described below. Specifically, the lineups were unreliable for a number of reasons, including cross-race or "other group" bias, the amount of time the witnesses saw the shooter, poor lighting and light adaptation, two married witnesses conferring with each other prior to talking to giving statements, and the witnesses' discrepancies about shooter's height.

66.     Plaintiff was also the only person in the array with a fat lip, like he had been in a fight.

67.     Prior to administration of the line ups, Defendant Hyatt did not document the specific descriptions given by all of the eyewitnesses. He did not instruct the witnesses not to discuss their perception of the event with other co-witnesses.

68.     The interviews of the witnesses and line ups were not recorded. Video recording would have served to secure a record of behavioral cues such as decision time, spontaneous comments and confidence cues that are diagnostic of accuracy.   Video recording would also have moderated potential suggestive behaviors by the line-up administrators, establishing proof as to exactly what instructions were given to the eyewitness, recording how long it took the witness to make an identification and establishing verbal and nonverbal records of the confidence expressed by the witness.

69.     Prior to the administration of the line ups, the witnesses were all separated and interviewed. Interviews of the witnesses together contaminated the identifications. As

a result of this contamination, the independence of each statement was not preserved. Contact between the witnesses introduced systematic errors in memory including witnesses to recall incorrect details that were suggested or inferred.

70.    Jeffrey, Sarah, and Marshall were on scene and not separated by law enforcement.

71.    Jeffrey and Sarah were married. When they were interviewed by Defendant Hyatt in their living room, having already been interviewed by Officers Meeks and Mercier, they were interviewed together, contaminating the independence of their recollection and in violation of common sense and the standard police lineup operations/procedures. This is evidenced by Detective Hyatt's report which attributes Jeffrey's description of the shooter to Sarah's noting only that her description corroborated his.

72.    Sarah and Jeffrey also were not instructed not to speak about the case and obviously did so. When witnesses talk with each other about their memories, they influence one another such that their subsequent individual memory reports are contaminated with what others have recalled.

73.    In this case, there was no preservation of the witnesses' original statements or descriptions of the shooter. Though almost a dozen officers investigated the scene the early morning of the shooting, and at least three officers spoke directly to witnesses, only one officer, Defendant Hyatt, wrote a police report recounting the interviews conducted by the other officers.

*Exculpatory Evidence*

74.   Defendant Hyatt claimed that three witnesses advised them that the shooter was a black male approximately 17-20 years old, 5'06" to 5'08" tall, having a dark complexion with short hair and wearing a white shirt and dark shorts.

75.   However, Defendant Hyatt was aware that the witnesses gave these descriptions after viewing the shooter (who was in the street) for only seconds from their back porch, from a window in the kitchen, and from behind a cardboard-covered wrought iron screen door in the middle of the night.

76.   Defendant Hyatt learned from Jeffrey that he saw two young black females running down the street and into the alley across from where Gregory was shot just prior to the shooting. Jeffrey told them he was 100% sure he could identify one of the black females. Jeffrey subsequently told them the black female was Jazzy J.  Defendant Hyatt learned that Jeffrey was 100% incorrect that Jazzy J had been in the area and running at the time of the shooting.

77.   Defendant Hyatt learned that what they claimed the witnesses told them amounted to stories with inconsistencies. The witnesses were inconsistent as to the shooter's clothing, his weapon and other facts.

78.   Defendant Hyatt also learned early on that witnesses reported seeing Gregory's SUV crash and a young black male run up to the partially open window on the passenger side of Gregory's SUV, put his arm through the window, and shoot Gregory as he was slumped over and lying in the passenger seat.

79.    Defendant Hyatt was aware that Jeffrey had a history of intravenous drug use and mental health problems. This information was not disclosed to the defense.

80.    Defendant Hyatt began a romantic and sexual relationship with Sarah after he met her when he reported to the scene of the murder.

81.    Defendant Hyatt also learned that incontrovertible evidence established that an individual named Keyon Draper ("Draper") committed the murder.   The evidence establishing Draper's guilt of the murder includes but is not limited to the following:

1) In 2013, the State interviewed a neighbor, Randolph Thornton, who told the State that he saw a close friend of Draper's, Demetry Coleman, at the murder scene. He also told the State that someone confessed the murder to him. The State filed a motion to exclude Thornton as witness in the second trial in 2016;

2) Draper's fingerprint matched the latent print lifted from Gregory's SUV;

3) The print was in the exact location one would expect to find the print of a shooter that fired multiple shots into the front passenger window of the SUV;

4) Draper had a motive, unlike Plaintiff, to commit the murder in that Gregory had disrespected Coleman's sisters;

5) Defendants were aware that Carleton Spiller was killed because he planned to notify them that Draper was the actual killer of Gregory;

6) After the shooting, the shooter ran in the direction of Coleman's house, where Draper spent the majority of his time in the Summer of 2011;

7) Draper's physical description matches the description of the shooter given by the witnesses, a young black male (18 years old) with short hair, a dark complexion, and 5'6" tall;

8) Draper was a person of interest in a murder that took place on August 13, 2011 at 4244 California Street, one block over the Coleman residence as well as one block over from where Leonard Gregory was shot;

9) Draper had felony convictions for unlawful use of a weapon, possession of a defaced weapon, and burglary in the first degree, all of which occurred in 2010 and 2011;

10) Draper was out of custody on July 17, 2011, and was subsequently arrested on September 29, 2011 and sent to the Department of Corrections on May 4, 2012;

11) Draper was known to law enforcement as a documented member of the "39 Darkside Mob" street gang as early as February of 2010;

12)  Draper's St. Louis City booking photos from January of 2010, February 2010, and September 2011 all reflect that Keyon Draper had a short or low haircut, was only 5 '6" tall, and weighted 120-130 pounds;

13)  Draper was eighteen years old at the time Gregory was killed; and

14)  Draper is described in St. Louis Metropolitan Police reports as being black with a dark complexion and thin, matching the physical appearance that matched the description Defendants claim was given by the State's eyewitnesses of the shooter.

82.    Despite the lack of any evidence against Plaintiff and the overwhelming evidence against Draper, Defendant Hyatt ignored any evidence they did not believe incriminated Plaintiff. After the lineups, Defendant Hyatt did little to nothing to investigate the murders further.

83.    There was no investigation into motive or even into why Gregory was in this high crime area known for drug dealing and prostitution at 3 a.m.

84.    Defendant Hyatt returned Gregory's cell phone to Gregory's family without analyzing the phone. Thus, the police failed to obtain any evidence of Gregory's phone calls, text messages, or contacts on the phone.

85.    Defendant Officers ignored that Plaintiff had a solid, verifiable alibi.

86.    Plaintiff was arrested despite the fact the murder weapon was never tied to him. No DNA, fingerprints, or other physical evidence linked him to the crime or to Gregory. Plaintiff was excluded as the person who left the fingerprints on the front passenger side window of the SUV. The prints matched Draper.

### *Star Witness Sarah and Defendant Lead Investigator Hyatt*

87.    Star witness Sarah and Defendant Hyatt had a very close relationship that blossomed into something more than a cop/witness relationship and included frequent communication prior to trial.

88.    Defendant Hyatt became Sarah's hero, someone she surely wanted to please, and eventually her love interest. Jeffrey and Sarah divorced soon after the second trial as did Defendant Hyatt and his wife, Christine.

89.    Next, Sarah and Defendant Hyatt married each other.

90.    Upon information and belief, they are still married and living in Florida.

91.    Despite the lack of evidence, Plaintiff was forced to trial twice due to Defendants' violations of his rights.

92.    After the second trial, on October 7, 2016, Plaintiff was convicted and sentenced to life imprisonment in the Missouri Department of Corrections on Count I concurrent with twenty years on Count II.

93.    While awaiting his trial Plaintiff was deprived of economic opportunities and suffered economic harm. Even more so, Plaintiff endured intense physical pain, great mental anguish, and overwhelming emotional pain. Plaintiff suffered separation from his family and friends and lived in an environment where any day he could have been beaten, sexually assaulted, or even murdered.

94.    On August 8, 2011, while in the jail at the St. Louis Justice Center Jail at 200 S. Tucker in St. Louis, Plaintiff was sexually assaulted by inmate Charles T. Hervey (DOC ID 173367) who is currently incarcerated on a number of sexual offenses at the Jefferson City Correctional Center.

95.    As a result of the Defendants Officers' unconstitutional conduct, Plaintiff spent 4,156 days incarcerated for a crime he did not commit. He continued to be deprived of economic opportunities and suffered economic harm while in the Missouri Department

of Corrections. Plaintiff continued to endure incalculable mental anguish and emotional pain. He suffered separation from his family and friends and lived in an environment where any day he could have been beaten, sexually assaulted, or even murdered. Plaintiff languished in a prison cell not knowing if he would have to spend the rest of his remaining life behind prison walls.

96.    Plaintiff's damages include, but are not limited to, past and future physical injuries and pecuniary losses, emotional distress, mental anguish, humiliation, loss of reputation, loss of liberty, loss of enjoyment of life, loss of consortium, and other non-pecuniary losses.

## COUNT I:

### VIOLATION OF THE FOURTH AND FOURTEENTH TO THE UNITED STATES CONSTITUTION: (AGAINST ALL INDIVIDUALLY NAMED DEFENDANTS)

### RECKLESS INVESTIGATION (42 U.S.C. § 1983)

97.    Each paragraph of this Complaint is incorporated as if fully set forth herein.

98.    In summary, as alleged more fully above, individual Defendants and unknown Defendants, acting individually, jointly, and in conspiracy, engaged in an unconstitutional reckless investigation as described above.

99.    Defendant Hyatt conducted unnecessarily suggestive photo lineups and physical lineups, depriving Plaintiff of his right to due process and a fair trial.

100.    Defendant Hyatt threatened and coerced witnesses to identify Plaintiff as the perpetrator when they knew, or reasonably should have known, Plaintiff was not the perpetrator.

101.   Defendant Officers physically abused Plaintiff in an attempt to obtain a false confession and/or false incriminating statements from him.

102.   Defendants ignored exculpatory information which clearly established Plaintiff's absolute innocence which they learned of during the investigation and continued to encourage and pursue the prosecution of Plaintiff.

103.   Defendants fabricated evidence which unconstitutionally bolstered identifications they knew to be unreliable by fabricating evidence to falsely inculpate Plaintiff.

104.   Defendants intentionally avoided investigation that would exonerate Plaintiff.

105.   Defendants suppressed evidence that undermined the possibility that Plaintiff committed the crime.

106.   Defendants acted with malice and deliberate indifference to Plaintiff's constitutional rights.

107.   Defendants' actions, singularly and cumulatively, shocked the conscience.

108.   In the foregoing manner, Defendants and unknown Defendants initiated Plaintiff's prosecution.

109.   Absent the unconstitutionally reckless investigation, the proceedings were initiated against Plaintiff without probable cause.

110.   As a consequence of the criminal prosecution, Plaintiff suffered a deprivation of liberty apart from his initial seizure.

111.   Plaintiff's criminal prosecution ultimately terminated in his favor in a manner indicative of his innocence.

112.   As a direct and proximate result of Defendants' unconstitutional conduct, Plaintiff was arrested, prosecuted, and convicted of a crime he did not commit.

113. As a further direct and proximate result of Defendants' unconstitutional conduct, Plaintiff suffered injuries and damages, including but not limited to the loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT II:

**VIOLATION OF THE FOURTH AND FOURTEENTH
TO THE UNITED STATES CONSTITUTION:
(AGAINST ALL INDIVIDUALLY NAMED DEFENDANTS)**

**MALICIOUS PROSECUTION
(42 U.S.C. § 1983)**

114.   Each paragraph of this Complaint (Paragraphs 1-115) is incorporated as if fully set forth herein.

115.   In summary, as alleged more fully above, Defendant Hyatt, Defendant Officers, and unknown Defendants, acting individually, jointly, and in conspiracy, procured through unconstitutional means the most significant evidence putatively implicating Plaintiff in the crime, *i.e.*, the identifications made by Jeffrey Mooney, Sarah Mooney and Joseph Marshall.

116.   Defendants then unconstitutionally bolstered those identifications they knew to be unreliable by fabricating evidence to falsely inculpate Plaintiff, intentionally

19

avoiding investigation that would exonerate Plaintiff, and suppressing evidence that undermined the notion that Plaintiff committed the crime.

117.    Defendant Hyatt, Defendant Officers, and unknown Defendants, acted with malice and deliberate indifference to Plaintiff's constitutional rights.

118.    In the foregoing manner, Defendant Hyatt, Defendant Officers, and unknown Defendants, initiated Plaintiff's prosecution.

119.    Absent the unconstitutionally obtained and unreliable evidence, the proceedings were initiated against Plaintiff without probable cause.

120.    As a consequence of the criminal prosecution, Plaintiff suffered a deprivation of liberty apart from his initial seizure.

121.    Plaintiff's criminal prosecution ultimately terminated in his favor in a manner indicative of his innocence.

122.    As a direct and proximate result of Defendant Hyatt, Defendant Officers, and unknown Defendants' unconstitutional conduct, Plaintiff was arrested, prosecuted, and convicted of a crime he did not commit.

123.    As a further direct and proximate result of Defendant Hyatt, Defendant Officers, and unknown Defendants' unconstitutional conduct, Plaintiff suffered injuries and damages, including but not limited to the loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT III:

**VIOLATION OF DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION:**

**UNLAWFUL SUPPRESSION OF EVIDENCE/*BRADY* VIOLATION (AGAINST ALL INDIVIDUALLY NAMED DEFENDANTS) (42 U.S.C. § 1983)**

124.    Each paragraph of this Complaint is incorporated as if fully set forth herein.

125.    In summary, as more fully alleged above, Defendant Hyatt, Defendant Officers, and unknown Defendants routinely withheld exculpatory, material evidence from the defense.

126.    The withheld evidence includes, but is not limited to, evidence that Defendant Hyatt and star State witness Sarah Mooney began and continued a romantic and sexual relationship during Plaintiff's prosecution.

127.    The withheld evidence includes, but is not limited to, evidence that the line ups were unduly suggestive rendering the results obtained unreliable.

128.    The withheld evidence includes, but is not limited to, evidence that there was significant material evidence that Kenyon Draper committed the murder.

129.    Had the foregoing evidence been disclosed, Plaintiff would not have been convicted.

130.    Defendants acted with malice and deliberate indifference to Plaintiff's constitutional rights.

131.    As a direct and proximate result of Defendant Hyatt, Defendant Officers, and unknown Defendants' unconstitutional conduct, Plaintiff was arrested, prosecuted, and convicted of a crime he did not commit.

132.   As a further direct and proximate result of Defendant Hyatt, Defendant Officers, and unknown Defendants' unconstitutional conduct, Plaintiff suffered injuries and damages, including but not limited to the loss of liberty, physical sickness and injury, emotional pain and suffering, lost wages from his job, and other grievous and continuing injuries and damages as set forth above.

## COUNT IV:

### VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION:

### FABRICATION OF EVIDENCE (AGAINST ALL INDIVIDUALLY NAMED DEFENDANTS) (42 U.S.C. § 1983)

133.   Each paragraph of this Complaint is incorporated as if fully set forth herein.

134.   In summary, as more fully alleged above, Defendant Hyatt, Defendant Officers, and unknown Defendants, acting individually, jointly, and in conspiracy, fabricated evidence later offered at Plaintiff's trial.

135.   Defendant Hyatt, Defendant Officers, and unknown Defendants knowingly fabricated evidence and that false evidence affected the decision of the jury.

136.   Defendant Hyatt, Defendant Officers, and unknown Defendants thereby rendered Plaintiff's court remedy ineffective, violating Plaintiff's constitutional right to access to the courts.

137.   Defendant Hyatt, Defendant Officers, and unknown Defendants acted with malice and deliberate indifference to Plaintiff's constitutional rights.

138.    As a direct and proximate result of Defendant Hyatt, Defendant Officers, and unknown Defendants' unconstitutional conduct, Plaintiff was arrested, prosecuted, and convicted of a crime he did not commit.

139.    As a further direct and proximate result of Defendant Hyatt, Defendant Officers, and unknown Defendants' unconstitutional conduct, Plaintiff suffered injuries and damages, including but not limited to the loss of liberty, physical sickness and injury, emotional pain and suffering, lost wages from his job, and other grievous and continuing injuries and damages as set forth above.

## COUNT V:

### VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION:

### CONSPIRACY TO DEPRIVE CONSTITUTIONAL RIGHTS (AGAINST ALL INDIVIDUALLY NAMED DEFENDANTS) (42 U.S.C. § 1983)

140.    Each paragraph of this Complaint is incorporated as if fully set forth herein.

141.    In summary, as more fully alleged above, Defendant Hyatt, Defendant Officers, and unknown Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and therefore to deprive him of his constitutional rights, all as described in this Complaint.

142.    In doing so, these co-conspirators conspired to accomplish an unlawful purpose by unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability depriving Plaintiff of these rights.

143.    In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

144.    Defendant Hyatt, Defendant Officers, and unknown Defendants acted with malice and deliberate indifference to Plaintiff's constitutional rights.

145.    As a direct and proximate result of Defendant Hyatt, Defendant Officers, and unknown Defendants' unconstitutional conduct, Plaintiff was arrested, prosecuted, and convicted of a crime he did not commit.

146.    As a further direct and proximate result of Defendant Hyatt, Defendant Officers, and unknown Defendants' unconstitutional conduct, Plaintiff suffered injuries and damages, including but not limited to the loss of liberty, physical sickness and injury, emotional pain and suffering, lost wages from his job, and other grievous and continuing injuries and damages as set forth above.

**COUNT VI:**
**FAILURE TO INTERVENE**
**(AGAINST ALL INDIVIDUALLY NAMED DEFENDANTS)**
**(42 U.S.C. § 1983)**

147.    Each paragraph of this Complaint is incorporated as if fully set forth herein.

148.    In the manner described more fully above, during the constitutional violations described herein, one or more of Defendant Hyatt, Defendant Officers, and unknown Defendants, stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even having the opportunity to do so.

149.    Defendant Hyatt, Defendant Officers, and unknown Defendants acted with malice and deliberate indifference to Plaintiff's constitutional rights.

150.   As a direct and proximate result of Defendant Hyatt, Defendant Officers, and unknown Defendants' unconstitutional conduct, Plaintiff was arrested, prosecuted, and convicted of a crime he did not commit.

151.   As a further direct and proximate result of Defendant Hyatt, Defendant Officers, and unknown Defendants,' unconstitutional conduct, Plaintiff suffered injuries and damages, including but not limited to the loss of liberty, physical sickness and injury, emotional pain and suffering, lost wages from his job, and other grievous and continuing injuries and damages as set forth above.

### COUNT VII:
### MONELL CLAIM
### FOR FAILURE TO TRAIN
### (AGAINST THE DEFENDANT CITY OF ST. LOUIS, MISSOURI)
### (42 U.S.C. § 1983)

152.   Each paragraph of this Complaint is incorporated as if fully set forth herein.

153.   Defendant City of St. Louis, acting through its policy makers, had a custom or practice of failing to train police officers such as Defendant Hyatt on their constitutional obligation to assure full disclosure to criminal defendants of personal relationships between any such officers and another individual who is identified as a witness in a criminal investigation or prosecution in which an officer is also involved.

154.   Alternatively, policy makers within the City of St. Louis know to a moral certainty that their police officers may have or may develop personal relationships with witnesses beyond that of a criminal investigator and a witness; that training and supervision is necessary to help officers know to recognize the significance of such relationships, and to help make the difficult decision to disclose such relationships when they do exist; that

making the decision to conceal evidence of such a relationship will deprive the accused of his or her constitutional right to a fair trial; and that the lack of training for police officers on this disclosure requirement will frequently lead to depriving the accused of a fair trial.

155.   The policy makers of the City of St. Louis were deliberately indifferent to the need for training, and supervision to assure compliance with training, so as to equip officers to identify and to properly respond to their obligations for disclosing personal relationships with criminal case witnesses, as alleged in paragraphs 153 and 154 above.

156.   As a direct and proximate result of the actions and inactions identified in paragraphs 153, 154, and 155  above, Defendant Hyatt failed to disclose his relationship with Sarah to prosecutors and/or to Plaintiff's criminal defense counsel, and thereby deprived Plaintiff's criminal defense counsel of the ability to use that information to impeach Sarah and Defendant Hyatt at Plaintiff's criminal trials by inquiring about and showing Sarah's bias as a witness against Plaintiff and in favor of the prosecution team so as to gain the favor of Defendant Hyatt and secure a career-enhancing conviction for Defendant Hyatt.

157.   If Defendant Hyatt had disclosed this information to Plaintiff's criminal defense counsel, there is a reasonable probability that the outcome would have been different, and Plaintiff was thereby damaged by being wrongfully prosecuted and convicted.

### COUNT VIII:
### MALICIOUS PROSECUTION
### (AGAINST ALL INDIVIDUALLY NAMED DEFENDANTS)
### MISSOURI STATE LAW CLAIM

158.   Each paragraph of this Complaint is incorporated as if fully set forth herein.

159.   In the manner described more fully above, Defendants, acting individually, jointly, and in conspiracy with each other, instituted or continued the prosecution of Plaintiff without probable cause. As a consequence of the criminal prosecution, Plaintiff was unlawfully seized, deprived of liberty, and wrongfully convicted of a crime for which he is innocent. Plaintiff's criminal prosecution was terminated in his favor in a manner indicative of innocence.

160.   Defendants accused Plaintiff of criminal activity of knowing those accusations to be without genuine probable cause, and they made statements to prosecutors with the intent of exerting influence to institute and continue the judicial proceedings.

161.   Statements of the Defendants regarding Plaintiff's alleged culpability were made with knowledge that such statements were false. In so doing, Defendants fabricated evidence and withheld exculpatory information.

162.   Defendants were acting under color of law and within the scope of their employment when they took these actions.

163.   As a direct and proximate result of Defendants' actions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, including but not limited to the loss of liberty, physical sickness and injury, emotional pain and suffering, lost wages from his job, and other grievous and continuing injuries and damages set forth above.

## COUNT IX:
## CIVIL CONSPIRACY
## (AGAINST ALL INDIVIDUALLY NAMED DEFENDANTS)
## MISSOURI STATE LAW CLAIM

164.   Each paragraph of this Complaint is incorporated as if fully set forth herein.

165.    In the manner described above, Defendants acting in concert with other known and unknown co-conspirators in a malicious combination, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

166.    In furtherance of the conspiracy, Defendants committed overt acts and were otherwise willful participants in joint activity including but not limited to the malicious prosecution of Plaintiff and the intentional infliction of emotional distress upon him.

167.    Defendants were acting under color of law and within the scope of their employment when they took these actions.

168.    As a direct and proximate result of Defendants' actions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, including but not limited to the loss of liberty, physical sickness and injury, emotional pain and suffering, lost wages from his job, and other grievous and continuing injuries and damages set forth above.

### COUNT X:
### INDEMNIFICATION
### (AGAINST THE CITY OF ST. LOUIS, MISSOURI)
### MISSOURI STATE LAW CLAIM

169.    Each paragraph of this Complaint is incorporated as if fully set forth herein.

170.    Missouri state law provides that Defendant City of St. Louis is directed to pay any tort judgment for compensatory damages for which its employees are liable within the scope of their employment activities.

171.    Defendant Officers were employees of Defendant City of St. Louis acted within the scope of their employment at all times relevant in committing the actions and omissions described herein.

**RELIEF REQUESTED**

WHEREFORE, the Plaintiff requests relief as follows:

1)      An award of nominal, punitive, compensatory, and presumed damages in excess of $25,000 for each violation of Plaintiff's constitutional rights and his rights arising under state law;

2)      Awarding Plaintiff his attorney and expert witness fees and all other costs of litigation pursuant to 42 U.S.C. §1988, and under other applicable law;

3)      Pre-judgment and post judgment interest;

4)      The right to conform the pleadings to the proof and evidence presented at trial;

5)      Trial to a jury; and

6)      Such other relief as the Court deems just and equitable.

NEWMAN, COMLEY & RUTH P.C.

  /s/ Michael G. Berry
Michael G. Berry, #33790
601 Monroe Street, Ste. 301
P.O. Box 537
Jefferson City, MO 65101
573-634-2266
573-636-3306 (fax)
michaelberry@ncrpc.com

ATTORNEYS FOR PLAINTIFF