UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| LAMONT CAMBELL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 4:23-CV-1547 SRW |
| | ) |
| JIMMY HYATT, et al., | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM AND ORDER**

This matter comes before the Court on Defendant City of St. Louis' Motion to Dismiss (ECF No. 23). The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to Title 28 U.S.C. § 636(c). The Court will deny the motion.

**I.     BACKGROUND**

Plaintiff Lamont Cambell filed a complaint under § 1983 in this Court alleging Defendants Jimmy Hyatt, Michael Pratt, John Winter, Joseph Dudley, and the City of St. Louis ("the City") violated his constitutional rights when they wrongfully prosecuted him for murder. In his complaint, Plaintiff asserts ten counts under § 1983 and state law. In response to the complaint, Defendants Winters, Pratt, and Dudley filed a motion to dismiss asserting Plaintiff failed to state a claim against them and they are entitled to qualified immunity. The City filed a motion to dismiss challenging Plaintiff's *Monell* and indemnification claims. In response to the motions, Plaintiff filed a motion to dismiss Defendants Pratt, Winter, and Dudley, and the indemnification claim against the City. The Court granted the motion and dismissed Defendants Pratt, Winter, and Dudley, as well as the indemnification claim.

1

The following claims remain pending:[1]

(1) Violation of the Fourth and Fourteenth Amendments; Reckless Investigation; against Defendant Hyatt;
(2) Violation of the Fourth and Fourteenth Amendments; Malicious Prosecution; against Defendant Hyatt;
(3) Violation of Due Process Clause of the Fourteenth Amendment; Unlawful Suppression of Evidence/*Brady* violation; against Defendant Hyatt;
(4) Violation of Due Process Clause of the Fourteenth Amendment; Fabrication of evidence; against Defendant Hyatt;
(5) Violation of Due Process Clause of the Fourteenth Amendment; Conspiracy to Deprive Constitutional Rights; against Defendant Hyatt;
(6) Failure to Intervene; against Defendant Hyatt;
(7) *Monell* Claim for Failure to Train; against City of St. Louis;
(8) Malicious Prosecution under state law; against Defendant Hyatt; and
(9) Civil Conspiracy under state law; against Defendant Hyatt.

Currently before the Court is the City's motion to dismiss count seven, wherein Plaintiff alleges the City had a custom or practice of failing to train police officers, such as Defendant Hyatt, on their constitutional obligation to disclose to criminal defendants any personal relationships between officers and witnesses. The City argues Plaintiff fails to allege a plausible claim for relief under *Monell*. The Court accepts the following facts as alleged in the complaint as true.

On July 17, 2011, at 3:30 a.m., Leonard Gregory was shot and killed on the 2800 block of Chariton Street in St. Louis, Missouri. Mr. Gregory was the son of a retired St. Louis City Metropolitan Police sergeant. Defendant Hyatt and Officers Van Nest and Mercier arrived at the scene at approximately 4:16 a.m. and were met by others including Officers Neals and Meeks. Defendant Hyatt learned that Mr. Gregory's vehicle had crashed into another vehicle, causing that vehicle to crash into a third one. Mr. Gregory was slumped in the driver's seat of his dark-colored SUV, with an apparent gunshot wound to his head. He was pronounced dead shortly thereafter. The scene of the crime was not well-lit.

---

[1] The claims are brought under § 1983 unless stated otherwise.

2

Defendant Hyatt wrote all of the reports of the interviews conducted at the scene. He reported that Officer Mercier interviewed Jeffrey Mooney at the scene. Mr. Mooney told her he heard two to three gunshots and saw the SUV moving west before striking another vehicle. He then saw two black females and a black male enter the east alley of the 4200 block of Oregon. The black male turned and ran to the SUV, reached in the front passenger window, and fired several shots through the window. He then fled north into the alley, following the path of the two females. Mr. Mooney stated the black male was approximately 17-19 years old, 5'6" to 5'7" in height, with a dark complexion and short hair. He was wearing a white shirt, black shorts, and black shoes, and armed with what Mr. Mooney believed to be a silver handgun.

Defendant Hyatt reported that Mr. Mooney and his wife Sarah Mooney had seen the suspect in the area and Mr. Mooney was "positive he would be able to identify him again." Mr. Mooney also believed he could identify one of the females. Defendant Hyatt wrote that Officer Mercier interviewed Ms. Mooney at the scene, and she said she was asleep at the time, but awoke with the commotion. When she looked out the window, she saw the suspect firing into the window of the vehicle. Defendant Hyatt reported that Officer Mercier stated Ms. Mooney's description "corroborated with her husband's." There were no details of any description of the shooter from Ms. Mooney in Defendant Hyatt's report.

Officer Mercier also interviewed Joseph Marshall, who stated he heard the shots while inside his home. Mr. Marshall looked from his home and saw the vehicle crash. He saw a black male, approximately twenty years old, 5'7" to 5'8" in height, with a dark complexion and low haircut. He was wearing a white shirt, dark shorts, and holding a black, small-caliber pistol. Mr. Marshall saw this man shoot into the vehicle and go north through an alley. Officer Mercier interviewed Jason Puder, who lived at 4335 California, and was sitting in his living room when

3

he heard the shots. Mr. Puder reported the shooter was wearing a white shirt and dark jeans, but could not otherwise describe the shooter because of his distance from the scene. Defendant Hyatt was the only investigator to prepare a report of the witness interviews.

Later that day on July 17, Defendant Hyatt and Officer Sweeney, both homicide detectives, met with South Patrol Detectives Pratt, Winter, and Dudley, and discussed the details of their investigation. On July 18, Defendant Hyatt reported that Ms. Mooney called and stated that she and Mr. Mooney had seen one of the females. Ms. Mooney reported that the female was playing basketball in the alley on the 4200 block of California. Officers Leopold and Bertke responded and identified the female as Jazzy J. Defendant Hyatt and Officer Sweeney confronted Jazzy J, a fifteen-year-old female, at the police station on July 19. Jazzy J explained she was not in the area, and other evidence corroborated her statement. Jazzy J was released to her parents.

On July 19, Defendant Hyatt presented Mr. Mooney with a few photographs of young black men and included a photograph of Plaintiff because he was a young, black man who lived in the vicinity of the shooting. Defendant Hyatt claimed Mr. Mooney identified Plaintiff as the shooter. That same day, Defendant Hyatt and Officer Sweeney met with Ms. Mooney at a gas station near Plaintiff's home. They presented Ms. Mooney with photographs of young black men, including Plaintiff. Defendant Hyatt reported Ms. Mooney also identified Plaintiff as the shooter. Defendant Hyatt and Officer Sweeney then discussed the results of the lineup with Detectives Pratt, Winter, and Dudley.

On July 21, Detectives Pratt, Winter, and Dudley searched for Plaintiff in an unmarked car. When they found Plaintiff, they confronted him. Detective Pratt jumped out of the car, grabbed Plaintiff, and yelled, "Where are the sacks?" Plaintiff was forced into the back of their

4

vehicle, next to Detective Winter, who told Plaintiff, "You're not that big we can kill you and dump your body in a dumpster." They transported Plaintiff to the Southside police station.

At the police station, Plaintiff was put in a small room with a window covered by a shade. He was handcuffed by his wrist and chained to the floor for three hours. He was never given his *Miranda* rights, nor any food or drink. He was not allowed to go to the bathroom. Detectives Pratt and Dudley entered the room and told Plaintiff they had a warrant for his arrest, which was not true. Detective Dudley asked Plaintiff if he knew who invented the cotton gin. He also accused Plaintiff of the murder of Mr. Gregory. Plaintiff denied any involvement or knowledge of who had been involved, but Detective Dudley continued to accuse him. Detective Winter was also present at times during the interrogation.

At various times, Detectives Pratt, Dudley, and Winter physically struck Plaintiff. They hit him with open fists on the side of his head and face. As a result, he suffered great pain and his lip swelled. At one point, Detective Pratt grabbed Plaintiff around his neck with both hands and choked him. He lifted Plaintiff's entire body off the floor and then slammed Plaintiff back in his chair. No one prepared a report reflecting that Plaintiff was transported to the Southside station at any time, or what happened while they were there. After the interrogation, Detectives Pratt, Dudley, and Winter drove Plaintiff to homicide headquarters.

Once at headquarters, Defendant Hyatt confronted Plaintiff. Neither Defendant Hyatt, nor anyone else, read Plaintiff his *Miranda* rights. Defendant Hyatt repeatedly, and angrily, yelled at Plaintiff that he had committed the murder. He ignored Plaintiff's denials. Defendant Hyatt told Plaintiff that his alibi, that he was babysitting his stepsister, Stephanie Miles, was not credible because Ms. Miles and his stepmother, Tisa Campbell, had criminal records. Defendant Hyatt told Plaintiff three witnesses identified him as the shooter.

Plaintiff was placed in a physical lineup. He was shorter, smaller, and appeared younger than anyone else in the lineup. Defendant Hyatt claimed Mr. and Ms. Mooney viewed the lineup and selected Plaintiff. Defendant Hyatt was with them when they each viewed the lineup. On July 22, Plaintiff's photograph was placed in a photographic array that Defendant Hyatt claimed was viewed by Mr. Marshall. Defendant Hyatt reported that he showed the array to Mr. Marshall at the corner of California and Chariton. This is the corner where Plaintiff routinely got off the school bus to go home. According to Defendant Hyatt, Mr. Marshall selected Plaintiff as the perpetrator. Mr. Marshall stated he was not 100 percent sure of his identification. Plaintiff was the only person in the lineup with a fat lip, like he had been in a fight.

Before conducting the lineups, Defendant Hyatt did not document the specific descriptions of the suspect given by the eyewitnesses, and he did not instruct the witnesses not to discuss their perception of the event with other witnesses. The interviews of the witnesses and the lineups were not recorded. Before the administration of the lineups, the witnesses were separated and interviewed. Mr. and Ms. Mooney and Mr. Marshall were "on scene" and not separated by law enforcement.

Mr. and Ms. Mooney were married. When they were interviewed by Defendant Hyatt in their living room, after being interviewed by Officers Meeks and Mercier, they were interviewed together. Mr. and Ms. Mooney were instructed not to speak about the case, but obviously did so. The witnesses' original statements and descriptions of the shooter were not preserved. Despite almost twelve officers investigating the scene, only one officer, Defendant Hyatt, wrote a police report recounting the interviews conducted by the other officers.

Defendant Hyatt reported that three witnesses told him the shooter was a black male, approximately 17-20 years old, 5'6" to 5'8" in height, with a dark complexion, short hair, and

6

wearing a white shirt and dark shorts. Defendant Hyatt was aware the witnesses gave these descriptions after viewing the shooter, who was in the street, for only a few seconds from either their back porch, a window in the kitchen, or from behind a cardboard-covered, wrought-iron screen door in the middle of the night. The witnesses stories were inconsistent as to the shooter's clothing, weapon, and other facts. Defendant Hyatt was aware Mr. Mooney had a history of intravenous drug use and mental health problems. This information was not disclosed to Plaintiff's defense team.

Defendant Hyatt learned of evidence establishing that Keyon Draper committed the murder. This evidence included: (1) in 2013, the State interviewed a neighbor, Randolph Thornton, who stated he saw a close friend of Mr. Draper's, Demetry Coleman, at the murder scene. He also told the State someone confessed the murder to him. In 2016, the State filed a motion to exclude Mr. Thornton as a witness in Plaintiff's second trial; (2) Mr. Draper's fingerprint matched the latent print lifted from Mr. Gregory's SUV; (3) the print was in the exact location one would expect to find the print of a shooter that fired multiple shots into the front passenger window of the SUV; (4) Mr. Draper had a motive, unlike Plaintiff, to commit the murder because Mr. Gregory had disrespected Mr. Coleman's sisters; (5) Defendant Hyatt and the City knew Carleton Spiller was killed because he planned to tell them Mr. Draper was the killer; (6) after the shooting, the shooter ran in the direction of Mr. Coleman's house, where Mr. Draper spent the majority of his time in the summer of 2011; (7) Mr. Draper's physical description matches the description of the shooter given by the witnesses; (8) Mr. Draper was a person of interest in a murder that took place on August 13, 2011, at 4244 California Street, one block away from the Coleman residence and where Mr. Gregory was shot; (9) Mr. Draper had felony convictions from 2010 and 2011 for unlawful use of a weapon, possession of a defaced

weapon, and burglary in the first degree; (10) Mr. Draper was out of custody on July 17, 2011, was arrested on September 29, 2011, and sent to the Department of Corrections on May 4, 2012; (11) Mr. Draper was known to law enforcement as a documented member of the "39 Darkside Mob" street gang as early as February 2010; (12) Mr. Draper's St. Louis City booking photos from January 2010, February 2010, and September 2011, all reflect that he had a short or low haircut, was 5'6" tall, and weighed 120-130 pounds; (13) Mr. Draper was 18 years old at the time of the shooting; and (14) Mr. Draper is described in St. Louis Metropolitan Police reports as being black with a dark complexion, and thin, matching the description given by the eyewitnesses of the shooter.

Defendant Hyatt ignored any evidence he did not believe incriminated Plaintiff. After the lineups, Defendant Hyatt did little to investigate further. There was no investigation into motive or why Mr. Gregory was in this high-crime area known for drug dealing and prostitution at three a.m. Defendant Hyatt returned Mr. Gregory's cell phone to his family without analyzing the phone, or obtaining any phone calls, text messages, or contacts from the phone. Officers ignored that Plaintiff had a solid, verifiable alibi. Plaintiff was arrested despite the fact the murder weapon was never tied to him, nor was there any DNA, fingerprints, or other evidence linking him to the crime. Plaintiff was excluded as the person who left the fingerprints on the front passenger side window of the SUV – the prints that matched Mr. Draper.

Defendant Hyatt began a romantic and sexual relationship with Ms. Mooney after meeting her at the scene of the murder. Their relationship included frequent communication. Defendant Hyatt became Ms. Mooney's hero and eventually her love interest. Mr. and Ms. Mooney divorced soon after the second trial, as did Defendant Hyatt and his wife, Christine.

8

Defendant Hyatt and Ms. Mooney then got married. Upon information and belief, they are still married and living in Florida.

Plaintiff was put on trial twice for Mr. Gregory's murder. On October 7, 2016, after the second trial, Plaintiff was wrongfully convicted of murdering Mr. Gregory. He was sentenced to life in prison and served over eleven years in prison. While awaiting trial, Plaintiff was deprived of economic opportunities and suffered economic harm. He also endured intense physical pain, mental anguish, and overwhelming emotional pain. He suffered separation from his family and friends and lived in an environment where any day, he could have been beaten, sexually assaulted, or even murdered. On August 8, 2011, while in the St. Louis Justice Center jail, Plaintiff was sexually assaulted by inmate Charles T. Hervey, who is currently incarcerated at the Jefferson City Correctional Center on several sexual offenses. Plaintiff spent 4,156 days incarcerated for a crime he did not commit.

## II.     STANDARD

The purpose of a motion to dismiss for failure to state a claim is to test the legal sufficiency of the complaint. As the Supreme Court held in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), a complaint must be dismissed pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted if it does not plead "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. A plaintiff need not provide specific facts in support of his allegations, *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam), but must include sufficient factual information to provide the "grounds" on which the claim rests, and "to raise a right to relief above a speculative level." *Twombly*, 550 U.S. at 555 & n.3. *See also Schaaf v. Residential Funding Corp.*, 517 F.3d 544, 549 (8th Cir. 2008). This obligation requires a plaintiff to plead "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action

9

will not do." *Twombly*, 550 U.S. at 555. A complaint "must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Id.* at 562 (quotation omitted). On a motion to dismiss, the Court accepts as true all of the factual allegations contained in the complaint, and reviews the complaint to determine whether its allegations show that the pleader is entitled to relief. *Id.* at 555-56; Fed. R. Civ. P. 8(a)(2).

### III. DISCUSSION

In his complaint, Plaintiff alleges the City failed to train and supervise officers such as Defendant Hyatt on their constitutional obligation to disclose criminal defendants of personal relationships between officers and witnesses in a criminal investigation or prosecution. In its motion to dismiss, the City asserts Plaintiff fails to allege a plausible claim for relief under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), because he has not established the City knew of a pattern of inappropriate or undisclosed relationships between its officers and witnesses.

Section 1983 of Title 42 allows individuals to bring causes of action for violations of the United States Constitution. This section states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .

42 U.S.C. § 1983. A municipality can be sued under § 1983 for an officer's misconduct if the constitutional violation "resulted from (1) an 'official municipal policy,' (2) an unofficial 'custom,' or (3) a deliberately indifferent failure to train or supervise." *Mick v. Raines*, 883 F.3d

1075, 1079 (8th Cir. 2018) (quoting *Corwin v. City of Independence*, 829 F.3d 695, 699 (8th Cir. 2016)).

Inadequate training may serve as the basis for "[section] 1983 liability only where the failure to train amounts to deliberate indifference." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). To show deliberate indifference, a plaintiff must prove the municipality "had notice that its procedures were inadequate and likely to result in a violation of constitutional rights." *See Jennings v. Wentzville R-IV Sch. Dist.*, 397 F.3d 1118, 1122 (8th Cir. 2005) (quoting *Larson v. Miller*, 76 F.3d 1446, 1454 (8th Cir. 1996)). "A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *See S.M. v. Lincoln Cty.*, 874 F.3d 581, 585 (8th Cir. 2017). "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

Plaintiff has not alleged a pattern of similar constitutional violations in this case. Instead, Plaintiff relies on the "narrow range of circumstances" the Supreme Court left open in *Canton* when a pattern of similar violations is not necessary to establish deliberate indifference. *Connick*, 563 U.S. at 63. In the "rare" case, "the unconstitutional consequences of failing to train [can] be so patently obvious that a city [can] be liable under § 1983 without proof of a pre-existing pattern of violations." *Id*. at. 64. The example the Supreme Court supplied in *Canton* of such a situation was "a city that arms its police force with firearms and deploys the armed officers into the public to capture fleeing felons without training the officers in the constitutional limitation on the use of deadly force." *Id*. at 63 (citing *Canton*, 489 U.S. at 390 n.10). Because of the frequency with which police arrest fleeing felons, it is obvious, in this example, that a failure to train will result in a violation of constitutional rights. *Id*. at 63-64.

11

In contrast, in *Connick*, the Supreme Court held that a failure to train prosecutors on their *Brady* obligations does not fall within the narrow single-incident exception finding that "the obvious need for specific legal training that was present in the *Canton* scenario [was] absent." *Id*. at 64. The Supreme Court differentiated the two situations stating that police officers make "split-second decisions with life-or-death consequences" and police academy applicants are not necessarily familiar with when deadly force is a constitutional violation. *Id*. Therefore, without training, new officers would not have any way to obtain the obviously necessary knowledge. *Id*. However, lawyers are trained in the law, with continuing education requirements after formal education ends. The "regime of legal training and professional responsibility" makes "constitutional violations [] not the obvious consequence of failing to provide prosecutors" with training on how to obey the law. *Id*. at 65-66.

Since *Canton*, the Supreme Court has yet to find a single-incident case which presents a viable *Monell* claim based on a municipality's failure to act without a pattern of past violations. *J.K.J. v. Polk Cty.*, 960 F.3d 367, 380 (7th Cir. 2020). However, other courts have found circumstances where the single-incident theory has applied. *Id*. (noting the Seventh Circuit "has done so twice."). In *Ferguson v. Short*, the Western District of Missouri decided a motion to dismiss similar to this one. 2014 WL 3925512 (W.D. Mo. Aug. 12, 2014). The plaintiff alleged violations of § 1983 arising out of the defendants' investigation and prosecution of the plaintiff for a murder. *Id*. at *1. The plaintiff alleged the city defendant failed to train its officers on their constitutional *Brady* obligations and relied on the single-incident exception to establish deliberate indifference. *Id*. at *9.

*Ferguson* held that the "failure to train non-attorneys on the disclosure requirements of the Constitution can give rise to a Monell claim even without any instance of prior constitutional

12

violations." *Id*. The court cited to the following cases in support: *Davis v. Clark Cty., Wash.*, 966 F. Supp. 2d 1106, 1137 (W.D. Wash. 2013); *Cristini v. City of Warren*, 2012 WL 5508369 at *12-13 (E.D. Mich. Nov. 13, 2012); *Crews v. Cty. of Nassau*, 996 F. Supp. 2d 186, 210 (E.D. N.Y. 2014); and *Gregory v. City of Louisville*, 444 F.3d 725, 752-56 (6th Cir. 2006). In each of these cases, as well as *Ferguson*, the district court held that because the cases involved police officers and not attorneys, there were issues of fact as to whether the failure to train officers on their obligations under *Brady* "would result in unconstitutional consequences [] so patently obvious that [the municipality] should be held liable under § 1983 without proof of a preexisting pattern of violations." *Davis*, 966 F. Supp. 2d at 1137 (internal quotations omitted); *Cristini*, 2012 WL 5508369 at *13; *Gregory*, 444 F.3d at 752-56; *Crews*, 996 F. Supp. 2d at 210.

In *LeFever v. Ferguson*, the Southern District of Ohio came to the opposite conclusion in deciding the City of Newark's motion for summary judgment by holding that the plaintiff could not rely on the single-incident exception to establish deliberate indifference because the court could not "say that a failure to train police officers in *Brady* would lead to the highly probable consequence [of] a constitutional violation." 2013 WL 3568053 at *8 (S.D. Ohio Jul. 11, 2013). The court reasoned that because it was the prosecutor's proactive duty to track down and disclose *Brady* material, a police officer's failure to do so would not necessarily result in a constitutional violation. *Id*. The court stated, "even if police officers may not have been trained in the nuances of *Brady*, prosecutors' legal training and professional responsibility (as described in [*Connick*]) are a buffer against recurring constitutional violations." *Id*.

This matter is before the Court on a motion to dismiss for failure to state a claim. At this stage of the proceeding, the Court accepts as true all of the factual allegations contained in the complaint. Plaintiff has sufficiently alleged that the City knew "to a moral certainty that their

13

police officers may have or may develop personal relationships with witnesses beyond that of a criminal investigator and a witness . . . [and] the decision to conceal evidence of such a relationship will deprive the accused of his or her constitutional right to a fair trial." ECF No. 1 at 25-26. The City's failure to train Defendant Hyatt on this disclosure requirement would, and did, result in the highly probable consequence of violating an individual's constitutional rights and depriving the accused of a fair trial. The complaint further alleges the City was "deliberately indifferent to the need for training, and supervision to assure compliance with training, so as to equip officers to identify and to properly respond to their obligations for disclosing personal relationships with criminal case witnesses[.]" *Id.* at 26. As a direct and proximate result of the City's actions and inactions, Defendant Hyatt failed to disclose his relationship with a key witness depriving Plaintiff of a fair trial which led to his wrongful prosecution and conviction. *Id.*

Plaintiff is not required to allege a pattern of similar incidents to establish deliberate indifference; he may rely on the single-incident exception from *Canton* and *Connick*. The Court finds the complaint contains "direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Twombly*, 550 U.S. at 562. Therefore, the Court will deny the City's motion to dismiss.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant City of St. Louis' Motion to Dismiss (ECF No. 23) is **DENIED**.

So Ordered this 15th day of May, 2024.

_____
**STEPHEN R. WELBY**
**UNITED STATES MAGISTRATE JUDGE**